UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ZIMMER US, INC.                          )
                                         )
                    Plaintiff,           )
                                         )        Case No. 3:12-CV-395-JD-CAN
          v.                             )
                                         )
TROY KEEFER, et al.,                     )
                                         )
                    Defendants.          )

**OPINION AND ORDER**

   The plaintiff has sued the defendants – two former employees and their new employer – to enjoin the former employees from violating the terms of a non-competition agreement they signed while employed by the plaintiff, and to collect various associated relief. On July 24, 2012, the court granted the plaintiff's request for a Temporary Restraining Order. [DE 9, modified by stipulation at DE 40]. Thereafter, the court accepted briefing on the plaintiff's motion for a preliminary injunction and held a two-day hearing on the issue. For the reasons stated herein, the court GRANTS the plaintiff's request.

**Background**

   Plaintiff Zimmer, Inc. ("Zimmer") is corporation with a national presence that develops, manufactures, sells and distributes orthopedic medical and/or trauma devices, products, processes, and services. Defendants Troy Keefer and Kevin Yingling both worked for an independent distributor of Zimmer products known as Zimmer-Randall Associates, Inc., before they began working directly for Zimmer. [DE 16-1 ¶ 3]. As a Zimmer distributor, Zimmer-Randall and its sales force solicited orders for certain Zimmer implants, devices and services from clients within their

geographic region. Keefer began working for Zimmer-Randall as a sales representative on or about June 29, 1999. [DE 16-1 ¶ 4]. Yingling began as a trauma specialist with Zimmer-Randall on February 28, 2005, and was later promoted to a sales associate position. [DE 16-1 ¶ 5]. Keefer and Yingling worked together in the "keystone region," made up of most of Pennsylvania, and parts of Ohio and West Virginia. Specifically, Keefer and Yingling were responsible for certain accounts located within an approximately 60 mile radius of Altoona, Pennsylvania, although their territory did not include every account within that radius. [DE 16-1 ¶ 6]. They also played a consultative or collaborative role for sales associates servicing the remainder of the keystone region.

In November 2011, Zimmer-Randall's principal, Mark Randall, informed Zimmer that he planned to retire. In January, 2012, the companies announced that Zimmer-Randall would dissolve upon Randall's retirement. Zimmer would internalize the Zimmer-Randall sales force and essentially take the distributorship in the keystone region in-house. Zimmer announced that Vincent Fath, a Zimmer employee, would be the new general manager for the keystone region. [DE 16-9 ¶ 3]. Fath soon began to meet with Zimmer-Randall associates, including Keefer and Yingling, to discuss their future with Zimmer. [DE 16-9 ¶ 4]. Both Keefer and Yingling were considered exemplary sales associates, whose territory accounted for over $6,000,000 in yearly sales, and Zimmer (and Fath) hoped to retain their services after the switch.

On April 17, 2012, Zimmer gave Keefer a written offer of employment as team lead for the same region he had covered while working for Zimmer-Randall. The offer letter [DE 7-2] laid out the compensation structure and conditions of employment, and included a space for Keefer to sign to indicate his acceptance. It also instructed Keefer to execute the accompanying "Confidentiality, Non-Competition and Non-Solicitation Agreement for Sales Managers and Representatives"

("Agreement"). [DE 7-3]. In fact, the offer letter made clear that Keefer's employment was expressly conditioned on the execution of the Agreement, which essentially prohibited Keefer from competing with Zimmer within the keystone region for the duration of his employment and for a period of 12 months following any potential separation. [DE 7-2 at 2; DE 7-3]. On April 19, 2012, Keefer executed the offer letter and Agreement and returned them to Zimmer, thereby indicating his acceptance of the offered position. Yingling was likewise offered employment as a direct Zimmer employee via an April 17, 2012 written offer of employment. He was offered a position as a sales representative covering his former Zimmer-Randall territory. [DE 7-4]. His offer letter – aside from laying out a different compensation scheme, etc. – was materially identical to Keefer's. It, too, was accompanied by an Agreement, and it was expressly conditioned on the acceptance of that Agreement. [DE 7-4; DE 7-5]. Yingling accepted the offer and executed the Agreement on April 20, 2012. [DE 7-4]. Thus, after roughly thirteen and seven years, respectively, of selling and marketing Zimmer products and services under the Zimmer-Randall banner, Keefer and Yingling took their sales practices in-house.

Less than three months later, on July 17, 2012, Keefer and Yingling surprised their colleagues at Zimmer by jointly resigning from their employment, effective immediately. [DE 16-2; DE 16-3]. Their letters – which were nearly identical – indicated that because they resigned within a "90 day Introductory Period" referenced in their offer letters, they did not consider themselves bound by the restrictive covenants in their Agreements. Soon, Zimmer learned that Keefer and Yingling had accepted positions working for defendant Three Rivers Orthopaedic & Spine Products, Inc. ("Three Rivers"). [DE 16-1 ¶ 21]. Three Rivers is an independent distributor of products which are directly competitive to the Zimmer products Keefer and Yingling sold and marketed for Zimmer,

including products manufactured by Stryker Orthopaedic ("Stryker"), one of Zimmer's largest competitors. [DE 16-1 ¶ 21]. Troubled by the indication that Keefer and Yingling did not consider themselves bound by the Agreements and the revelation that they had taken up with a competitor, Zimmer made an effort to check in with their old accounts. While no Zimmer clients have yet reported contact with Keefer or Yingling, Zimmer claims that one client, which accounted for ~$500,000 in yearly revenue, indicated it would consider a switch to follow those trusted sales representatives. [DE 16-1 ¶ 23].

Litigation followed soon thereafter. Zimmer sued under this court's diversity jurisdiction to enjoin and restrain the defendants from violating the Agreements, and the defendants sued in the Western District of Pennsylvania seeking a declaratory judgment that they were not bound by the Agreements. The two suits have been consolidated before this court – the Agreements contained a choice of law clause selecting Indiana law and a choice of forum clause selecting the Northern District of Indiana – and have progressed to the preliminary injunction stage. This court accepted briefing [DE 16; DE 18; DE 21], and held a hearing on the plaintiff's motion for preliminary injunction. [DE 33; DE 34; DE 38; DE 39]. That motion is now granted for the reasons stated herein.

## Discussion

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted). "In assessing whether a preliminary injunction is warranted, we must consider whether the party seeking the injunction has demonstrated that '1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will

suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest.'" *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001)). The district court must exercise its discretion to arrive at a decision "based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986).

The decision-making process also involves a "sliding scale" analysis, at least to the extent that "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting *Abbott Labs.*, 971 F.2d at 12). But there is still a threshold to be met. A total failure to meet any one of the test's requirements cannot be compensated by a strong showing with respect to another. *See, e.g., East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005) (holding that, if a moving party cannot show that there is no adequate remedy at law, "a court's inquiry is over and the injunction must be denied."); *Jolivette v. Husted*, ___ F.3d ___, 2012 WL 4051214 at *4 (6th Cir. Sept. 14, 2012) ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.").

## A.     Reasonable Likelihood of Success on the Merits

At this stage, the court need not be certain about the outcome of the case. *See S.E.C. v. Lauer*, 52 F.3d 667, 671 (7th Cir. 1995) ("The case is before us on an appeal from the grant of a preliminary injunction, and as is too familiar to require citation such a grant is proper even if the district judge is uncertain about the defendant's liability."); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996) (trial court "need not predict the eventual outcome on the merits with absolute assurance" at preliminary injunction stage). The plaintiff need only show a "reasonable likelihood" of success. *See St. John's*, 502 F.3d at 625. To assess the likelihood of success, the court looks to "standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 2011)). The courts agree that a plaintiff must present a prima facie case according to those substantive standards. *See* FPP § 2948.3 (collecting authorities). Additionally, while the degree of likelihood of success a plaintiff needs to show may vary from case to case depending on the balance of harms, *see Abbott Labs.*, 971 F.2d at 12, a plaintiff must in all cases show *some* reasonable chance of success on the merits as a threshold matter, or his claim fails. *Jolivette*, ___ F.3d ___, 2012 WL 4051214 at *4.

The substantive law governing this case is the law of the State of Indiana. In the Agreement, the parties agreed to submit to Indiana law regardless of any forum's choice-of-law rules to the contrary. [DE 7-10 § 13]. That agreement is consistent with legal principle. *See generally* RESTATEMENT (2D) OF CONFLICT OF LAWS § 187 (1971). Moreover, neither party contests the application of Indiana law to their contract dispute. In Indiana, "[n]oncompetition agreements or covenants not to compete are in restraint of trade and are not favored by the law." *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 172 (Ind. Ct. App. 2008) (citing *Central Indiana*

*Podiatry, P.C. v. Kreuger*, 882 N.E.2d 723, 729 (Ind. 2008); *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 91-92 (Ind. Ct. App. 2001)). Such a covenant will only be enforced where "the employer has asserted a legitimate interest that may be protected[,]" and where "the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited." *Id.* (citations omitted). The parties dispute the likelihood that Zimmer's case can pass any of those tests. But first, Keefer and Yingling make an issue of whether the Agreement applied at the time of their separation from the company at all. The court begins by addressing that question.

1.      **"Introductory Period" Issue**

In both Keefer and Yingling's cases, the Agreement was executed contemporaneously with an offer letter delivered by Zimmer as part of its attempt to take the Zimmer-Randall workforce in-house. The offer letters [DE 7-2; DE 7-4] were thorough, including explanations of the employees' expected compensation and benefits packages, as well as some basics about the Zimmer operation. Of particular note, the letters stated:

> **Conditions of Offer**
> This offer is contingent upon your execution of the enclosed Non-Disclosure, Non-Competition and Non-Solicitation Agreement.

Keefer and Yingling also zero in on another provision:

> **Introductory Period**
> New employees customarily have their performance reviewed during or at the end of approximately ninety (90) days of service. This Introductory Period review gives both Zimmer and you the early opportunity to evaluate the employment relationship. Even after this period, Zimmer considers your employment relationship "at will."

Each offer letter concluded with a demand that the recipient sign and return the letter to Zimmer by April 23, 2012, simultaneous with the return of the signed Agreement. Vincent Fath signed the

letters on behalf of Zimmer, and a sign-and-date line was left blank for the recipient, to be completed as an indication that the terms of employment were accepted. [DE 7-2 at 4; DE 7-4 at 4].

Keefer executed his offer letter and Agreement on April 19, 2012. [DE 7-2 at 4; DE 7-3 at 10]. Yingling executed his offer letter and Agreement on April 20, 2012. [DE 7-4 at 4; DE 7-5 at 10]. On July 17, 2012, Keefer and Yingling resigned from their employment with Zimmer. [DE 16-2; DE 16-3]. Each resigned by sending a functionally identical letter to Zimmer, which, among other things, stated: "Since I am giving this notice of my termination within the **90 day Introductory Period** it is my understanding that the [Agreement] is of no force and effect." [DE 16-2; DE 16-3 (emphasis original)]. Keefer and Yingling have now made that "understanding" the basis for their first argument that Zimmer is unlikely to succeed on the merits. They argue that the offer letter and the Agreement, as contemporaneous documents, must be read together, and that the completion of the Introductory Period was a condition subsequent to the applicability of the Agreement. That is an issue of contract interpretation.

At the outset, the court notes that the defendants are correct to read the documents together. The contemporaneous documents rule provides that in the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction will be construed together in determining the contract. *Gold v. Cedarview Mgmt. Corp.*, 950 N.E.2d 739, 743 (Ind. Ct. App. 2011) (citing *Salcedo v. Toepp*, 696 N.E.2d 426, 435 (Ind. Ct. App. 1998)). The application of the rule depends on the facts of each particular case. *GEICO Ins. Co. v. Rowell*, 705 N.E.2d 476, 482 (Ind. Ct. App. 1999) (citing *Ruth v. First Fed. Sav. and Loan Ass'n of LaPorte Cnty.*, 492 N.E.2d 1105, 1107 (Ind. Ct. App. 1986)). The offer letters and Agreements in this case were simultaneously executed and clearly pertain to the same transaction: the establishment of the

defendants' employment relationship with Zimmer. Moreover, each document internally references the other. The offer letters are expressly conditioned on the employees' acceptance of the terms of the Agreements, and explicitly instruct the parties to execute and return the offer letters and Agreements simultaneously. [DE 7-2 at 2, 3; DE 7-4 at 2, 3]. The Agreements contain a recital of the fact that "[t]he Company has offered Employee employment, contingent upon Employee's entering into this Agreement." [DE 7-3 at 1; DE 7-5 at 1]. The conditional employment offer referenced is, obviously, the offer letter. So, the two documents pertain to the same transaction, were clearly intended to be executed simultaneously, and make it clear that the execution of the Agreement was, essentially, a condition precedent to the employee's acceptance of the offer stated in the offer letter. These documents should be construed together.

Still, Zimmer has attempted to rebut that conclusion by pointing to the Agreement's integration clause:

> 18. **<u>Entire Agreement</u>**. This Agreement, including Recitals, constitutes the entire agreement of the parties with respect to the subjects specifically addressed herein, and supersedes any prior agreements, understandings, or representations, oral or written, on the subjects addressed herein. Notwithstanding the foregoing, to the extent the employee has an existing non-competition, confidentiality, and/or non-solicitation agreement in favor of Company and has breached or violated the terms thereof, Company may continue to enforce its rights and remedies under and pursuant to such existing agreement.

[DE 7-3 at 9; DE 7-5 at 9]. There are two primary reasons why Zimmer's argument is unpersuasive. First, the integration clause only indicates that the Agreement is fully integrated with respect to "the subjects specifically addressed herein[.]" The contents of the offer letter – in particular, the conditions of employments, compensation and benefits, and the Introductory Period – are not "subjects specifically addressed" within the Agreement. They are supplemental to it, not discussed

within it at all, and thus are not affected by the integration clause. Put another way, there simply is no indication here that the documents cannot be read together. *See Gold*, 950 N.E.2d at 753. Moreover, the Agreement also contains a modification provision:

> 15. **Modification**. This Agreement may not be amended, supplemented, or modified except by a written document signed by both Employee and a duly authorized officer of Company.

[DE 7-3 at 9; DE 7-5 at 9]. The offer letter meets the listed requirements. Even if it were otherwise excluded by the integration clause, it would count as an acceptable "supplement" under the Agreement's own terms. None of this means, however, that Zimmer is unlikely to succeed on the merits. It just means the court will consider the 90 day Introductory Period clause in its analysis. The next task is to interpret the effect of that clause.

"Interpretation of the language in a contract is a question of law[.]" *Simon Prop. Grp., L.P., v. Michigan Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070-71 (Ind. Ct. App. 2005) (citing *Art Country Squire, LLC v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App.2001)). "The goal of contract interpretation is to ascertain and enforce the parties' intent as manifested in their contracts." *JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*, ___ N.E.2d ___, 2012 WL 3332383 at *3 (Ind. Ct. App. Aug. 15, 2012) (citing *Gregg v. Cooper*, 812 N.E.2d 210, 215 (Ind. Ct. App. 2004)). To that end, the court construes a contract as a whole and considers all of the provisions of the contract, not just individual words, phrases, or paragraphs. *Id*. An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. *Id*. However, when a contract is clear and unambiguous, the language must be given its plain meaning. *Id*. (citing *Tippecanoe Valley Sch. Corp. v. Landis*, 698 N.E.2d 1218, 1221 (Ind Ct. App. 1998)). Keefer and Yingling argue that the Introductory Period clause operates as a

condition subsequent to the enforceability of the Agreements, meaning that their failure to complete that 90-day period released them from any obligations under the Agreements. *See Barrington Mgmt. Co., Inc. v. Paul E. Draper Family Ltd. P'ship*, 695 N.E.2d 135, 141 (Ind. Ct. App. 1998) ("A condition subsequent is a condition which, if performed or violated (as the case may be), defeats the contract."). Zimmer argues that the Introductory Period clause did not create a condition subsequent, but merely laid out the timetable for the employees' first significant performance review.

The defendants' argument is not a particularly strong one. First, the Introductory Period clause clearly does not create an *express* condition subsequent of the type proposed by the defendants, nor does any other clause in the offer letter or Agreement. There simply is no word, phrase, or provision, in the entirety of the documents at issue, which says the defendants have no obligation to honor the Agreement as long as they resign within the Introductory Period, or that their obligations under the Agreement are conditional upon its completion. The clause at issue simply says the Introductory Period gives both Zimmer and the employee "the early opportunity to evaluate the employment relationship." It does *not* say the employee has "the early opportunity to evaluate the employment relationship *and to quit without being bound by any other agreements you may have signed to the contrary*." No condition subsequent is expressly created.

Keefer and Yingling also suggest, however, that the condition may be implied, rather than express. Their primary argument in support of their position is that interpreting the Introductory Period clause in the way suggested by Zimmer renders it essentially superfluous, or inoperative. The argument rests on a pair of factual observations. First, it is undisputed that Keefer and Yingling's employment with Zimmer was at-will in its entirety, both during the 90-day Introductory Period and thereafter. Second, Bob Leopold testified at the evidentiary hearing that a supervisor could evaluate

11

an employee's performance at any time; he was not limited to doing so during the Introductory Period. In Indiana, it is well-settled that a court, when interpreting a contract, should give effect to all words, terms, and phrases rather than rendering some ineffective. *See Trustcorp Mortgage Co. v. Metro Mortgage Co., Inc.*, 867 N.E. 2d 203, 213 (Ind. Ct. App. 2007); *Orthodontic Affiliates, P.C. v. Long*, 841 N.E.2d 219, 222 (Ind. Ct. App. 2006) ("we will construe the language in a contract so as not to render any words, phrases or terms ineffective or meaningless"). Because the purpose Zimmer assigns to the Introductory Period clause is merely to give notice to the employee that he should expect a performance review within ninety days, and because it was common knowledge that a performance review could occur at *any* time, the defendants argue that Zimmer's interpretation renders the provision superfluous and ineffective in violation of the settled rule.

There are several problems with the defendants' argument. First, the evidence on which Keefer and Yingling rely – specifically, Bob Leopold's testimony about his practice of evaluating employee performance whenever necessary – is parol evidence. "In general, '[t]he parol evidence rule provides that extrinsic evidence is inadmissible to add to, vary, or explain the terms of a written instrument' if the terms of the instrument are clear and unambiguous." *Evan v. Poe & Assocs., Inc.*, 873 N.E.2d 92, 101 (Ind. Ct. App. 2007) (quoting *Cooper v. Cooper*, 730 N.E.2d 212, 215 (Ind. Ct. App.2000)). The defendants have not made much of a showing of ambiguity, and it is unlikely that their parol evidence concerning evaluation practices can be considered. Second, even if the evidence *is* considered, its relevance in this context is extremely limited. The question with respect to the rule invoked by the defendants is not whether every word or phrase of a contract has some effect or meaning against the backdrop of business-as-usual at Zimmer; the question is whether every word or phrase has some effect or meaning *within the scheme of the contract*. Viewed through that lense,

the defendants' argument collapses. Aside from the Introductory Period provision, no part of the offer letter or Agreement discusses the evaluation schedule for new employees. To the contrary, that provision is the only indication to the employees that they will be evaluated during the first 90 days of their employment, and it therefore has an independent import, however trivial.

Still, despite the weaknesses in the defendant's positions with respect to the Introductory Period clause, their biggest problem is the strength of Zimmer's plain-meaning position. The various restrictive covenants established by the Agreement are effective for the duration of the "restricted period," a term which the Agreement specifically defines:

> (5)   "Restricted Period" is defined as **the date Employee executes this Agreement**, continuing through the twelve (12) months after the Employee's last day of employment with Company unless otherwise extended by Employee's breach of this Agreement.

[DE 7-3 at 4-5; DE 7-5 at 4-5 (emphasis added)]. The meaning of this language is clear. The Agreement goes into effect immediately upon the execution of the Agreement, which, given the joint-execution scheme expressly contemplated by the offer letter, would necessarily coincide with the beginning of the defendants' employment at Zimmer. Such a scheme is consistent with general principles of Indiana law. *See Moore v. Review Bd. of the Ind. Emp't Sec. Div.*, 406 N.E.2d 325, 327 (Ind. Ct. App. 1980) (holding that an employment agreement is formed "when an offer of work is accepted"); *Batts v. Review Bd. of Ind. Emp't Sec. Div.*, 385 N.E.2d 1174, 1176 (Ind. Ct. App. 1979). And, when the language of a contract is clear and unambiguous, that language *must* be given its plain meaning. *See Tippecanoe Valley Sch. Corp.*, 698 N.E.2d at 1221. The court will not give it another meaning simply because an unrelated contractual provision – especially one which does not *expressly* contradict the provision in question – *might* imply something else. To the contrary, even if the defense does eventually succeed in persuading the court that the Introductory Period provision

13

is ambiguous, the courts task will be to find any meaning for it that does *not* contradict, or qualify through the application of an implied condition subsequent, the plain language indicating the immediate applicability of the restrictive covenants in the Agreement. To do otherwise would blatantly violate the rule the defendants themselves embrace, requiring that the court give effect to all words, terms, and phrases of the contract rather than rendering some ineffective. *See Trustcorp Mortg. Co.*, 867 N.E.2d at 213.

In summary, the court finds that Zimmer is reasonably likely to succeed on the merits, at least with respect to defeating any argument that the Agreement is unenforceable due to the operation of the Introductory Period clause. The defendants' arguments to the contrary are not strong,[1] and the plain language of the Agreement cuts in Zimmer's favor. The next step is to consider whether the Agreement itself is likely to be enforceable under Indiana law.

### 2.        Requirements of Indiana Law

As mentioned, in order to be enforceable, Zimmer must show that "the employer has asserted a legitimate interest that may be protected[,]" and that "the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited." *Gleeson*, 883 N.E.2d at 172. As the plaintiff and the proponent of the Agreement, it is Zimmer's burden to make the requisite showing, and the court's task is to determine whether Zimmer is reasonably likely to succeed.

---

[1] In addition to the arguments discussed in detail above, the defendants seem to have hinted at a potential mistake argument with respect to the operation of the Introductory Period clause. Keefer consulted an attorney friend before signing his Agreement and received what may have been bad advice: his friend counseled him that the Introductory Period meant he could resign within 90 days and not be bound by the Agreement. As sympathetic as the situation might be, a unilateral mistake of law is no defense to the enforceability of the Agreement. *See Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 356 (Ind. Ct. App. 1995) (unilateral mistake only warrants reformation of the contract when "accompanied by fraud or inequitable conduct by the remaining party[,]" which has not been alleged here).

### a.    Legitimate Protectable Interests

All that Zimmer must do at this stage is "show some reason why it would be unfair to allow the employee to compete with the former employer." *Unger v. FFW Corp.*, 771 N.E.2d 1240, 1244 (Ind. Ct. App. 2002) (citing *Titus*, 758 N.E.2d at 92). The Agreement is designed to prevent an ex-employee from using his knowledge of Zimmer's confidential information[2] or inventions,[3] as the terms are defined by the Agreement, to solicit business from Zimmer's customers or active prospects in competition with Zimmer. To allow an employee to do those things immediately upon his resignation would be unfair to Zimmer. Accordingly, this is clearly a legitimate, protectable interest. *See Hahn v. Drees, Perugini & Co.*, 581 N.E.2d 457, 460 (Ind. Ct. App. 1991) (included in a business's "protectable good will interest is the right, via a proper covenant not to compete, to restrict a former employee from enticing away the employer's old customers."); *see also Gleeson*, 883 N.E.2d at 173 (business "good will may be protected by a covenant not to compete"); *Titus*, 758

---

[2] "Confidential Information" is defined:

The term "Confidential Information" includes, but is not limited to, any and all of Company's trade secrets, confidential and proprietary information and all other information and data of Company that is not generally known to the public or other third parties who could derive economic value from its use or disclosure. Confidential Information includes, without limitation, technical information such as product specifications, compounds, formulas, improvements, discoveries, developments, designs, inventions, techniques, new products and surgical training methods, and research and development information; confidential business methods and processes; business plans and strategies; marketing plans and strategies; information pertaining to current and prospective customers; information pertaining to distributors; pricing information; costing information; non~public financial information; personnel information; and information about current and prospective products or services, whether or not reduced to writing or other tangible medium of expression, including work product created by Employee in rendering services for Company.

[3] "Invention" is defined:

The term "Invention" includes, but is not limited to ideas, programs, processes, systems, intellectual property, works of authorship, copyrightable materials, discoveries, and/or improvements which Employee discovers, invents, originates, develops, makes, authors, or conceives alone or in conjunction with others during Employee's employment with Company and/or within six (6) months after Employee's employment ends which relate to Company's present or future business. An Invention is covered by this Agreement regardless of whether i) Employee conceived of the Invention in the scope of Employee's employment; ii) the Invention is patentable; or iii) Company takes any action to commercialize or develop the Invention.

N.E.2d at 93 (confidential client information is protectable); *McGlothen v. Heritage Envtl. Servs., LLC*, 705 N.E.2d 1069, 1072-73 (Ind. Ct. App. 1999) (cost and pricing information is protectable). Keefer and Yingling's argument to the contrary rests primarily on their assertion that they do not, in fact, possess any confidential information, and that some of the forms of information defined as "confidential" by the Agreement are not real-world secrets. That is irrelevant. Under Indiana law, Zimmer has a legitimate interest in preventing Keefer and Yingling from stealing their clients or lending an unfair competitive advantage to Three Rivers no matter what information they use to do so, and the Agreements seek to protect that broad interest. *Hahn*, 581 N.E.2d at 460; [DE 7-3 at 5]. The fact that the Agreements also specifically limit Keefer and Yingling's ability to work for competitors and steal clients using certain types of information[4] does not somehow render Zimmer's interest in its client relationships illegitimate. Zimmer is reasonably likely to succeed on this point.

### b. Reasonable Temporal Scope

Indiana courts have upheld time restrictions longer than the one-year restriction contained in the Agreement. *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 278 (Ind. 1983) (two years); *Gleeson*, 883 N.E.2d at 174 (eighteen months); *Washel v. Bryant*, 770 N.E.2d 902, 904 (Ind. Ct. App. 2002). The defendants have argued against the 12-month restriction on the basis that they only worked for Zimmer for approximately two-and-a-half months after the switch from Zimmer-Randall. They have not cited a single case from any jurisdiction to support their argument, and they downplay a salient fact: they resigned. It is their fault they were only at Zimmer for a short time.

---

[4] The Agreements prohibit Keefer and Yingling from working for a competitor in a "prohibited capacity," defined as "any sales or sales management capacity and/or any other capacity in which Employee's knowledge of Confidential Information and/or Inventions would render Employee's assistance a competitive advantage to a Competing Organization."

Without any case law to the contrary, the court finds that the Agreement's 12-month temporal restriction is reasonably likely to pass the test.

### c. Reasonable Geographical Scope

The Agreements limit the defendants' ability to compete with Zimmer within the "restricted geographic area," defined as "any geographic territory assigned to Employee during Employee's last two years of employment with Company." The TRO originally requested by Zimmer and entered by this court prohibited the defendants from competing with Zimmer within a geographic territory consisting of a 60-mile radius around Altoona, Pennsylvania. [DE 9 at 8]. The defendants disputed the propriety of that limitation. Keefer and Yingling testified that nobody ever assigned them a 60-mile-radius "geographic territory." Instead, they were assigned to specific accounts within that region, including:

(a)     Altoona Regional Health System;
(b)     Nason Hospital;
(c)     Indiana Regional Medical Center;
(d)     Clearfield Hospital;
(e)     Punxsutawney Area Hospital;
(f)     J.C.Blair Memorial Hospital;
(g)     Altoona Surgery Center;
(h)     Indiana Regional Surgery Center; and
(i)     Advanced Center for Surgery (Altoona).

[DE 40]. It is true that each of these accounts was located within a 60-mile radius of Altoona, Pennsylvania, but several additional Zimmer accounts were also located within that geographical territory and were never assigned to Keefer or Yingling. Accordingly, the parties stipulated to a modification of the TRO limiting the restriction to the specific accounts the defendants worked on Zimmer's behalf. [DE 40].

Zimmer's willingness to limit the restraint to the accounts actually worked did away with Keefer and Yingling's objection to the breadth of the geographic restriction contained in the TRO. But they continue to object to the breadth of the geographic restriction contained in the Agreement. It is difficult to nail down the substance of the defendants' argument, but at oral argument counsel cited *Commercial Bankers Life Ins. Co. of America v. Smith*, 516 N.E.2d 110 (Ind. Ct. App. 1987). In that case, the Indiana Court of Appeals was asked to consider whether a restriction prohibiting an employee from working "within the area of his responsibilities" at his prior company was adequate. The court held that it was not. The phrase "area of responsibilities" could just as easily refer to the area of the business in which the employee worked as it could refer to a geographical area in which the employee worked, and the contractual context indicated the former. As a result, the phrase did not provide any geographical restriction at all. Obviously, no such problem exists in this case; the Agreement contains an explicitly geographical limitation. Perhaps more important to the issue here, though, the *Smith* court also discussed a pair of earlier court of appeals decisions, *Field v. Alexander & Alexander of Indiana, Inc.*, 503 N.E.2d 627 (Ind. Ct. App. 1987) and *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208 (Ind. Ct. App. 1982). Generally speaking, those cases held that a restrictive covenant could substitute a class of persons for whose business a former employee was prohibited from competing for a geographical area in which a former employee was prohibited from competing, without running afoul of the law. *Smith* clarified the *Field* and *Seach* rule as follows: "[A]lthough we held that a specific class could wholly replace the geographical term, we did not state that the class could be used to *define* a geographical boundary. The two terms are distinct. Either a defined, geographical boundary must exist in the covenant, or a specific limited

class of persons must be listed as those with whom contact is prohibited; references of one cannot be used to define the other." 516 N.E.2d at 114.

The defendants argue that the quoted statement presents a problem for Zimmer: the Agreement restricts the defendants from operating within their old geographical territories, but they never had a territory – they had only a scattered group of accounts. A restriction from operating within a geographical territory that did not exist is not a restriction at all, and a class of persons can only be used to set the boundaries of a restrictive covenant if it is laid out with specificity. This is one of the defendants' better arguments, but the court is still convinced Zimmer has a reasonable chance of prevailing on the issue. First, the fact that other Zimmer representatives also had accounts within the 60-mile radius of Altoona does not mean it cannot be considered a "geographical territory" assigned to the defendants. It is conceivable that Zimmer assigned more than two sales representatives to each geographic territory, and it is unclear why that state of affairs would make it unreasonable to prohibit any one of those representatives from operating throughout that entire territory with a restrictive covenant. For example, Keefer's years of experience, confidential knowledge of Zimmer products, pricing, and distribution models in the region may well lend a competitive advantage to Three Rivers in an attempt to steal a client from Zimmer, even if Keefer never had a sales relationship with that particular client. In fact, that is precisely what the first restrictive covenant attempts to avoid:

(A)     Employee will not, within the Restricted Geographic Area., be employed by, work for, consult with, provide services to, or lend assistance to any Competing Organization in a Prohibited Capacity.

It is not at all clear to the court that restricting *that* activity within a 60-mile radius around Altoona is unreasonably overbroad. Again, working in a "prohibited capacity" means using the employee's

knowledge of confidential Zimmer information or inventions to lend a competitive advantage to Three Rivers. [DE 7-3 at 4; DE 7-5 at 4]. Given that, the limitation seems a reasonable one to protect the Zimmer interest at stake – namely, keeping a competitor from taking advantage of an insider's knowledge of Zimmer's operations in the area to poach Zimmer accounts. *See Krueger*, 882 N.E.2d at 730 ("Whether a geographic scope is reasonable depends on the interest of the employer that the restriction serves.") (citing *Slisz v. Munzenreider Corp.*, 411 N.E.2d 700, 707-09 (Ind. Ct. App. 1980).

Moreover, the restriction in the second covenant is *already* limited to the accounts actually served by the defendants, specifically defined as required by *Smith*. The second covenant prohibits the defendants from doing business with any of Zimmer's "Customers or Active Prospects in the Restricted Geographic Area." [DE 7-3 at 5; DE 7-5 at 5]. "Customers" and "Active Prospects" are specifically defined as those Zimmer clients and prospective clients with whom the employee did business or solicited business within the preceding two years. [DE 7-3 at 5; DE 7-5 at 5]. Combining this limitation with the geographic scope limitation means the second restrictive covenant is already limited, by its terms, to the nine accounts the defendants actually served. It can reasonably be argued that the remaining covenants are likewise restricted to the scope necessary to serve their respective purposes. The court therefore finds that Zimmer does have a reasonable chance of succeeding on the merits with respect to this issue.

### d.    Types of Activity Prohibited

The defendants have not argued that the Agreements are unreasonable with respect to the types of activity they prohibit. Without any reason to reconsider, the court stands by its conclusion in issuing the TRO that the restriction is reasonable. The agreements do not prohibit the defendants

from working for a competitor in any capacity, only from working in a directly competitive capacity analogous to the one in which they worked for Zimmer. *See Gleeson*, 883 N.E.2d at 175-76 (holding that provisions are reasonable if they restrict future employment with a competitor to services provided during former employment). Parsing the various covenants, there are still a variety of things that Keefer and Yingling are permitted to do. For example, the first covenant – the only one which, by the terms of the Agreement, carries a prohibition that applies throughout the restricted geographical region – only prevents the defendants from providing a competitor-employer with a competitive advantage based on confidential information gained during their time with Zimmer. And the second covenant only prohibits the defendants from doing any business with those clients they actually worked with at Zimmer. As the court reads the Agreement, it would be perfectly acceptable for Keefer or Yingling to work in a sales capacity with the remaining accounts in the Altoona region, so long as they did not use protected Zimmer information to gain a competitive advantage in doing so. This is reasonable.

### 3.    Conclusion

For the reasons stated, the court finds that Zimmer has shown a "reasonable likelihood" of success in securing the enforcement of the Agreement according to its terms. *See St. John's*, 502 F.3d at 625. But that is just one fifth of the analysis. To grant the injunction, the court must still find that: 2) no adequate remedy at law exists; 3) Zimmer will suffer irreparable harm if it is denied; 4) the irreparable harm Zimmer will suffer without injunctive relief is greater than the harm the defendants will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest. *Id*.

**B.**     **Inadequacy of Remedies at Law**

"Like other equitable remedies, injunctions were designed to offer relief when legal remedies were unavailable or inadequate to protect the parties' rights." *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 397 (7th Cir. 1984) (Swygert, J., dissenting). In issuing the TRO, the court found that Zimmer's remedies at law were inadequate. The defendants have not contested that finding, and it is consistent with their admission in the Agreement:

> 11.     **Remedies**. Employee acknowledges that a breach or threatened breach by Employee of this Agreement will give rise to irreparable injury to Company and that money damages will not be adequate relief for such injury.

[DE 7-3 at 8; DE 7-5 at 8]. The Indiana Supreme Court has held that it is "virtually impossible to quantify" the damage caused by an employee's breach of a non-competition agreement. *Krueger*, 882 N.E.2d at 733. For the same reasons, the Indiana Court of Appeals has consistently found that a preliminary injunction is the appropriate remedy for any such breach or threatened breach. *Id.* (collecting cases). This court finds the same.

**C.**     **Irreparable Harm**

Notwithstanding the fact they signed their names to a document asserting that "irreparable injury" would follow from their threatened breach thereof, the defendants argue that Zimmer has not shown it will suffer irreparable harm in the absence of an injunction. They point out that Zimmer has not introduced any specific evidence of harm, or damages. [DE 18 at 22]. But the irreparable harm requirement "does not mandate that the party demonstrate specific losses in its business." *AGS Capital Corp., Inc. v. Product Action Intern., LLC*, 884 N.E.2d 294, 312 (Ind. Ct. App. 2008) (citing *Norlund v. Faust*, 675 N.E.2d 1142, 1149 (Ind. Ct. App. 1997)). If it could, then an injunction would rarely be appropriate, since the party could quantify and ask for monetary relief. *Id.* Much of the

harm Keefer and Yingling's defections will do to Zimmer's business in their area of operations is necessarily intangible – a loss of goodwill, a need to start over again on building personal relationships with the accounts previously serviced by the two, etc. – but that does not make it any less real. The fact that it cannot be quantified in a dollar amount is an argument in favor of equitable relief, not against it. And the real, quantifiable financial consequences of a breach could be severe. Keefer and Yingling were responsible for large accounts, built strong relationships with those accounts, and could divert a significant amount of business from Zimmer. The court stands by its finding that a breach would cause irreparable harm.

**D.     Balance of Harms**

The potential harm to Zimmer if the injunction is not issued is great. Keefer, Yingling and Three Rivers have made no secret of the fact that they intend to compete with Zimmer if the Agreements are not enforced. The accounts previously serviced by the two sales representatives account for over six million in yearly revenue, and their knowledge of Zimmer's products and operations, combined with their experience and reputations within the community, could create a significant competitive advantage for Three Rivers extending far beyond Keefer and Yingling's prior accounts. At the same time, the enforcement of the Agreement would significantly harm the defendants. Keefer and Yingling spent years building business relationships which they would now be forced to abandon, at least temporarily. Three Rivers, which has intervened in the case as a defendant, will be harmed in that it will continue to compensate Keefer and Yingling for performing a limited range of duties, without the benefit of the highly-profitable accounts they expected the two to take to Three Rivers with them. To some extent, the defendants can be said to have assumed these risks, since Keefer and Yingling signed the Agreements and Three Rivers was aware of the

Agreements when it hired them on, but the defendants contend they did so with the understanding that they had non-frivolous legal defenses to the Agreements' application. As a result, it would not be fair to ignore the potential harm to the defendants entirely.

When balancing the harms, it is useful to refer back to the plaintiff's likelihood of success on the merits. *See Abbott Labs.*, 971 F.2d at 12 ("the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side."). Even if the balance of harms is a wash in this instance, the court is impressed with the strength of Zimmer's case, and considers it highly likely that Zimmer will succeed on the merits. Given that, the balance need not weigh heavily in Zimmer's favor to warrant an injunction.

## E.     The Public Interest

The final question is whether the preliminary injunction will harm the public interest. *See St. John's*, 502 F.3d at 625. Here, this question blends considerably with the merits analysis. Non-competition agreements – at least when they are governed by Indiana law – are disfavored because they go against the public's interest in unrestrained trade. *See Gleeson*, 883 N.E.2d at 172 ("[n]oncompetition agreements or covenants not to compete are in restraint of trade and are not favored by the law."). But that concern is alleviated where "the employer has asserted a legitimate interest that may be protected[,]" and where "the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited." *Id.* In other words, where a non-competition agreement passes the legal tests and is enforceable, it is no longer against the public interest to enforce it. Given Zimmer's high likelihood of eventual success on the merits, the court finds that a preliminary injunction is not against the public interest.

**Conclusion**

The court **GRANTS** the plaintiff's motion for preliminary injunction. [DE 15]. To the extent that the defendants may yet prevail – and their arguments are certainly not frivolous – the court will order a bond posted to lessen the chance that they will be harmed without recourse by the injunction. The court **ORDERS** that defendants Troy Keefer and Kevin Yingling are enjoined from the following, for the duration of the term set out in the Agreements or until this Order is dissolved, and pending final resolution of the case:

1.    Working in a sales, or sales management, capacity or any other capacity in which their knowledge of Zimmer Confidential Information could give a competitive advantage to Three Rivers in their former Zimmer territories, consisting of a radius of approximately 60 miles around the center of Altoona, Pennsylvania.

2.    Communicating with their former Zimmer Customers or Active Prospects, particularly:
    (a)    Altoona Regional Health System;
    (b)    Nason Hospital;
    (c)    Indiana Regional Medical Center;
    (d)    Clearfield Hospital;
    (e)    Punxsutawney Area Hospital;
    (f)    J.C.Blair Memorial Hospital;
    (g)    Altoona Surgery Center;
    (h)    Indiana Regional Surgery Center; and
    (i)    Advanced Center for Surgery (Altoona).

3.    Divulging or using any of Zimmer's confidential information, including but not limited to, customer information, pricing, marketing, or business information.

Additionally, although the defendants' Agreements state that Zimmer shall be entitled to obtain injunctive relief without having to post any bond or other security, the court finds that the plaintiff shall post bond pursuant to Rule 65(c), which states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Seventh Circuit has cautioned that judges should "take

account of the risks their deeds create[,]" even where both parties to a disputed contract waive their entitlement to an injunction bond. *Roche Diagnostics Corp. v. Medical Automation Sys., Inc.*, 646 F.3d 424, 428-29 (7th Cir. 2011). This order therefore will become effective upon the plaintiffs' posting with the clerk of the court the sum of, or a surety for, $500,000.00 to serve as bond for the injunction.[5] The bond will insure that the defendants are compensated for their injury if Zimmer does not prevail on the merits, consistent with defense counsel's request at the hearing (although in a lower amount). *See Roche*, 646 F.3d at 428 ("A party injured by an erroneous preliminary injunction is entitled to be made whole").

 SO ORDERED.

 ENTERED: <u>October 23, 2012</u>

<u>  /s/ JON E. DEGUILIO  </u>
Judge
United States District Court

---

[5] It is difficult to quantify the exact amount in which the defendants could be damaged by the issuance of the injunction if they do ultimately prevail on the merits. Keefer and Yingling, for their parts, are currently being compensated by Three Rivers, and they do not stand to lose much over the course of the Agreement's enforcement as a result. Three Rivers, on the other hand, will be paying the individual defendants to do something much less than what they were hired for while the Agreement is in effect. The $500,000.00 figure is an approximation of the amount Three Rivers will pay to the individual defendants during that time period ($350,000.00 in salary and bonus for Keefer; $115,000.00 for Yingling). To go further and speculate as to what new revenues the defendants *might* have gained if they had succeeded in poaching clients from Zimmer would be unreasonable on this record.